**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 11** |
| **SUN MI NICHOLS** | ) | |
| | ) | **Case No. 19-56058- PWB** |
| | ) | |
| Debtor. | ) | |
| ----------------------------------------------------------- | ) | |
| **SUN MI NICHOLS** | ) | |
| | ) | |
| Plaintiff, | ) | **ADVERSARY PROCEEDING** |
| | ) | |
| v. | ) | |
| | ) | |
| **PAULPHILIP MANAGEMENT LLC,** | ) | |
| **NSEW GA INC, PAUL KWAK, and** | ) | |
| **MICHELLE KWAK** | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

COMES NOW Sun Mi Nichols ("Plaintiff"), by and through her undersigned counsel of record and file this COMPLAINT (the "Complaint") and in support thereof respectfully shows this Court as follows:

**BACKGROUND, JURISDICTION, AND VENUE**

1.      This adversary proceeding is a core proceeding and is related to the main Chapter 11 bankruptcy case of *In re: Sun Mi Nichols* pending in the Atlanta Division of the United States Bankruptcy Court for the Northern District of Georgia ("Bankruptcy Court") as Case No. 19-56058 ("Bankruptcy Case") which was filed on April 18, 2019 (the "Petition Date").

2.      Sun Mi Nichols ("Debtor") continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.      This Court has jurisdiction over this case under 28 U.S.C. § 1334(b) and 157(b), as well as under Bankruptcy Code §§ 105, 362, 547, 548, and 550.

4.      This Adversary Proceeding is filed pursuant to Federal Rule of Bankruptcy Procedure 7001 (hereinafter the "Bankruptcy Rules") and represents a core proceeding under 28 U.S.C. § 157(b)(1) and(2).

5.      Plaintiff Sun Mi Nichols is an individual who resides and is domiciled in Fulton County, Georgia.

6.      Defendant PaulPhilip Management LLC is a domestic limited liability company that may be served through its registered agent, Michelle Kwak, at 3625 Savannah Place, Suite 203, Duluth, Georgia 30096.

7.      Defendant NSEW GA INC. ("NSEW") is a domestic profit corporation that may be served through its registered agent, Michelle Kwak, at 3625 Savannah Place, Suite 200, Duluth, Georgia 30096.

8.      Defendant Paul Kwak is an individual who resides and is domiciled in Fulton County, Georgia and he can be served at his residence at 10015 Lauren Hall Court, Alpharetta, Georgia 30022.

9.      Defendant Michelle Kwak is an individual who resides and is domiciled in Fulton County, Georgia and she can be served at her residence at 10015 Lauren Hall Court, Alpharetta, Georgia 30022.

## **FACTUAL BACKGROUND**

10.     In August of 2018, Debtor saw an advertisement in a local Korean newspaper for a consulting firm, PaulPhilip Management, LLC (hereinafter referred to as "PPM"), which advertised plans that could help homeowners pay off their mortgages in five years

("Advertisement").  A true and correct copy of the Advertisement is attached hereto as Exhibit "A".

11.    Debtor contacted PPM and met with Paul Kwak ("Mr. Kwak") to inquire about the Advertisement.

12.    Mr. Kwak informed the Debtor that the program offered in the advertisement was not appropriate for her but that he could act as a business consultant to increase the revenues of her business to facilitate paying off the mortgage in a short period of time.

13.    The Debtor retained Mr. Kwak's services to act as a business consultant for her existing esthetician business, Dong Ann Skin Care, LLC.

14.    Mr. Kwak also incorporated Venus Skin Care, LLC ("Venus") on behalf of the Debtor and Victoria Skin Care, LLC on behalf of the Debtor's mother, Kum Rye Lee.  (Dong Ann, Venus and Victoria are hereinafter referred to as the "Businesses")

15.    Beginning in September 2018, Mr. Kwak induced the Debtor to pay PPM $5,000.00 a month in consulting fees in order to grow the Businesses to a value of $3,000,000.00 each.

**SAVANNAH PLACE PROPERTY**

16.    Additionally, Mr. Kwak induced the Debtor to enter into an a five year lease on behalf of Venus in a building located at 3625 Savannah Place Drive, Suite 101, Duluth, Georgia 30096, (the "Savannah Place Property").  A true and correct copy of the lease is attached hereto as Exhibit "B".

17.    The Savannah Place Property is owned by NSEW, a rental property company owned by Mrs. Kwak.

18.    The security deposit for the Savannah Place Property was $2,500.00 and the rent was $2,000.00 per month.

19.     When Mr. Kwak induced the Debtor to execute the lease, he persuaded her to begin paying rent on the Savannah Place Property even though a significant amount of construction was necessary before Venus could occupy the space. Also, Mr. Kwak informed the Debtor that as part of her lease, she would be required to pay for the construction on the Savannah Place Property. Mr. Kwak repeatedly told the Debtor that taking these actions would result in the growth of the Business to a value of $3,000,000.00 each.

20.     On or about September 12, 2018, Mr. Kwak suggested that the Debtor invest in the Savannah Place Property. He informed the Debtor that for a payment of $100,000.00 she could become a fifty percent owner of the Savannah Place Property (the "Real Estate Investment"). He then threatened to increase the rent if she did not invest. The Debtor agreed to the Real Estate Investment. Mr. Kwak never intended to transfer any interest in the Savannah Place Property and instead gave the Debtor a hand written piece of paper alleging to transfer ownership in the Savannah Place Property. Mr. Kwak defrauded the Debtor out of her interest in this property.

21.     Mr. Kwak then introduced the Debtor to Paul Kim ("Mr. Kim"), who owned an interior construction company, EY Bright Contracting, LLC, ("EY Bright Contracting") and additionally served as the pastor for the Good Samaritan Presbyterian Church. Mr. Kwak and Mr. Kim induced the Debtor to agree to fund the build out of the Savannah Place Property. The EY Bright Construction Proposal (the "Proposal"), dated September 1, 2018, promised to complete the project for $129,500.00. A later addition to the Proposal, dated October 29, 2018, stated additional work would need to be done for $15,700.00.

22.     As set forth below, Mr. Kwak then induced the Debtor to borrow additional funds to pay for the Proposal.

23.     All of the foregoing was a fraudulent inducement by Mr. Kwak to have the Debtor pay for the Savannah Place Property and the related Proposal for Mr. Kwak's personal benefit. Mr. Kwak had no intention of transferring any interest in the Savannah Place Property to the Debtor.

## CREDIT CARDS AND BUSINESS LOANS

24.     During the fall of 2018, using the Debtor's identity and credit information, Mr. Kwak took out multiple credit cards in the Debtor's name under the guise that the funds would be used to grow the Businesses.  Mr. Kwak would make charges and take cash advances on the cards (the "Fake Charges") and funnel the funds to himself and his affiliates.  A limited number of these cash advances would be deposited in the accounts of PPM and NSEW and then given back to Debtor by check.

25.     Specifically, Mr. Kwak charged her credit cards for alleged rents due to NSEW as well as various charges for consulting fees. In total, Mr. Kwak made charges to the Debtor's credit cards in excess of $60,000.00. Not surprisingly, the Fake Charges almost never matched the amount alleged due for the rent but would be for random amounts.

26.     Mr. Kwak opened business bank accounts at Bank of America and Wells Fargo Bank for the Businesses, as well as advising the Debtor to open a business bank account at NOA Bank. Mr. Kwak then advised the Debtor to frequently shuffle funds around these bank accounts with no explanation why.

27.     Mr. Kwak also applied for and received various business loans in the name of the Debtor, including but not limited to the following:

     a.   Funding Circle, LLC in the amount of $211,486.65;

     b.   Kabbage Loans in the amount of $15,379.33;

c.    Paypal Loan in the amount of $40,000.00.

Mr. Kwak used these funds under the guise of growing the Businesses.

28.    In late November of 2018, Mr. Kwak demanded that the Debtor give him twelve checks written for $5,000.00 each intended to cover the 2019 monthly consulting fee and twelve checks written for $2,000.00 each intended to cover the 2019 monthly rent due to NSEW.

## THE RESIDENCE

29.    On February 13, 2019, Mr. Kwak informed the Debtor that she needed to borrow an additional $110,000.00 from him to pay back various loans and finish the construction on the Savannah Place Property.

30.    The Debtor signed two promissory notes, one for $50,000.00 and a second for $60,000.00 (collectively, the "Notes"). True and correct copies of the Notes are attached hereto as Exhibits "C" and "D".  The Notes list NSEW as the lender.

31.    Mr. Kwak required the Debtor to use her residence located at 185 Treadstone Overlook Suwanee, Georgia 30024 (the "Residence") as collateral for the Notes and stated that he would release the lien on her home if the loan was satisfied by early January of 2020.

32.    Mr. Kwak did not have the Debtor sign a security deed but in fact, fraudulently induced the Debtor to sign a limited warranty deed transferring the Residence to his wife, Michelle Kwak. The limited warranty deed has been recorded in the Superior Court of Fulton County, Deed Book 59695, Page 664 (the "Warranty Deed"). A true and correct copy of the Warranty Deed is attached hereto and incorporated herein as Exhibit "E".

33.    At the time the Debtor executed the Warranty Deed, there was not a witness present and Mr. Kwak acted as the notary. Mr. Kwak informed the Debtor he would take the Warranty Deed "to be signed by a witness later."

34. The Debtor did not handle any of the $110,000.00 loan amount directly. Mr. Kwak used $50,000.00 to allegedly pay off the Debtor's loan to a third party.[1] Mr. Kwak also used the money from the loan to write two checks to EY Bright Contracting in the amount of $58,080.00 total.[2]

35. However, Mr. Kwak only gave Mr. Kim one check and kept the remaining funds.

## DEFAULT

36. On March 5, 2019, the Debtor received a demand letter from NSEW informing her that she was past due on her rent payments and that the entire balance of the lease had been accelerated. A true and correct copy of the Demand Letter is attached hereto as Exhibit "F".

37. Mr. Kwak further asserted that because the Debtor defaulted on paying rent, she was no longer a joint owner in the Savannah Place Property.

## COUNT ONE - PREFERENCE

38. Plaintiff adopts Paragraphs 1 through 37 of the Complaint herein as if they were stated verbatim.

39. During the one year period prior to the Debtor's Petition, Debtor transferred her Residence to or for the benefit of Defendants.

40. At the time of the transfer described in Paragraphs 39, Defendants alleged to be creditors of Debtor.

41. The transfer described in Paragraph 39 were for or on account of an alleged antecedent debt owed by the Debtor to Defendants before said transfers were made.

42. The transfers were made while Debtor was insolvent.

---

[1] As of the date of filing this complaint, the Debtor is unsure of the identity of the third party.
[2] NSEW check no. 1446 was made out for $30,000.00 and NSEW check no. 1447 was made out for $28,080.00.

43.    The transfers were made within the 90 day period prior to the date of the filing of Debtor's petition.

44.    The transfers enabled Defendants to receive more than Defendants would have received if the case was filed as a Chapter 7 case, the transfers had not been made, and Defendants had received payment of their alleged debt to the extent provided by the Bankruptcy Code.

45.    The transfers to or for the benefit of Defendants are void as against Debtor's creditors pursuant to 11 U.S.C. 547. Michelle Kwak is the initial transferee of these voidable transfers, and Debtor is entitled to recover the value of said transfers from Michelle Kwak pursuant to 11 U.S.C. 550(a)(1).

## COUNT TWO - FRAUD

46.    Plaintiff adopts Paragraphs 1 through 45 of the Complaint herein as if they were stated verbatim.

47.    Mr. Kwak is personally liable for the corporate conduct of PPM and NSEW because he personally took part in the commission of the complained of torts by participating and cooperating in the same. Further, Mr. Kwak specifically directed the particular complained of acts to be done. *See, e.g., Baja Properties, LLC v. Mattera*, 345 Ga. App. 101, 104, 812 S.E. 358, 362 (2018).

48.    PPM and NSEW, through Defendant Mr. Kwak, represented to the Debtor that they would provide her business with consultation services and provide her a rental property to house the Businesses. These representations were false and, at the time these representations were made to the Debtor, PPM did not intend to provide her with business consulting and NSEW did not intend to transfer any ownership interest in the Savannah Place Property.

8

49.    The Debtor reasonably relied on PPM and Mr. Kwak's representations and would not have taken out the numerous loans had she known that Mr. Kwak and PPM's representations were false and that Defendants intended to defraud both the Debtor and the Businesses.

50.    The Debtor reasonably relied on NSEW and Mr. Kwak's representations and would not have agreed to invest in the Savannah Place Property had she known that Mr. Kwak and NSEW's representations were false and that they did not intend to transfer any ownership interests to her.

51.    The Debtor reasonably relied on Mr. Kwak's representations regarding "business advice" because he put himself out as a business consultant and acted within a capacity in which he owed her a fiduciary duty.

52.    As a result of such tortious conduct, the Debtor has suffered damages at the hand of Defendants and their schemes, and has been harmed in an amount to be determined at trial.

## COUNT THREE- FRAUDULENT TRANSFER

53.    Plaintiff adopts Paragraphs 1 through 52 of the Complaint herein as if they were stated verbatim.

54.    During the four year period prior to the petition, Debtor made numerous transfers to entities for the benefit of Defendants, not for the benefit of the Debtor. These transfers, include without limitation, the following:

    a.    transfer of The Debtor' home to Mrs. Kwak;

    b.    multiple transfers of funds to PPM and NSEW for alleged "services rendered" or "rent owed";

55.    At the time of the transfers described in Paragraph 54, numerous creditors held claims against the Debtor. Those claims arose before the transfers referenced in Paragraph 54.

56.    Mr. Kwak fraudulently forced Debtor into making the transfers set forth in Paragraph 54:

      a.    with actual intent to hinder, delay, or defraud its current creditors and with actual intent to hinder, delay, or defraud future creditors; or

      b.    without receiving a reasonably equivalent value in exchange for the transfers, and the Debtor

          i.    was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or

          ii.    Intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they become due.

57.    Mr. Kwak tricked the Debtor into making the transfers described in Paragraph 54 without receiving a reasonable equivalent value in exchange for the transfers.

58.    At the time of the transfers described in Paragraph 54, Debtor was insolvent on the date of said transfers or became insolvent as a result of said transfers.

59.    The fraudulent transfers described in Paragraph 54 are voidable pursuant to 11 U.S.C. § 544, and Georgia statutes O.C.G.A. §§ 18-2-74 and 18-2-75, and the Debtor is entitled void the transfers to Defendants. The Debtor is entitled to recover the value of the transfers, and the value (therefore, Plaintiff's damages pursuant to 11 U.S.C. § 550) will be proven with more certainty at the trial of this matter.

## COUNT FOUR- BREACH OF FIDUCIARY DUTY

60.    Plaintiff adopts Paragraphs 1 through 59 of the Complaint herein as if they were stated verbatim.

61.    At all times relevant herein, Mr. Kwak, through his companies PPM and NSEW, was acting as a business consultant to the Debtor.

62.    As a business consultant, Mr. Kwak owed a fiduciary duty to the Debtor.

63.    Also, at the insolvency of Debtor, Mr. Kwak, in his capacity of business consultant, owed a fiduciary duty to the creditors of Debtor.

64.    Mr. Kwak, in his role as business consultant, owed to the Debtor and the Debtor's creditors at all times during the Debtor's insolvency, a fiduciary duty of good faith, with the care of an ordinary prudent person in a like position under similar circumstances, and in a manner reasonably believed to be in the best interests of the Debtor and its creditors.

65.    By virtue of these duties, Mr. Kwak was required, among other things, to exercise the utmost good faith, reasonable care and due diligence in connection with any and all transactions affecting the financial affairs of Debtor and to determine whether the Debtor received value commensurate with transfers made.

66.    Mr. Kwak breached his duty by the following actions, including, without limitation, the following:

    a.    The fraudulent monetary transfers to PPM and NSEW as set forth herein;

    b.    The fraudulent transfer of Debtor's home, the Residence, to Mrs. Kwak;

67.    Mr. Kwak did not act in good faith or in an informed and deliberate manner, but rather at his personal whim. Loyalty and care was given only to the personal interests of Mr. Kwak, his wife, PPM and NSEW, not to Debtor or the creditors of Debtor.

68.    Mr. Kwak's breach of duty has damaged Debtor in an amount to be proven with more certainty at the trial of this matter.

69.    The breach of duty on behalf of Mr. Kwak was willful and intentional.

70.    As a result of the breach of duty by Mr. Kwak, Debtor is entitled to recover its damages from Mr. Kwak in an amount to be proven with more certainty at the trial of this matter.

## <u>COUNT FIVE-CONVERSION</u>

71.    Plaintiff adopts Paragraphs 1 through 70 of the Complaint herein as if they were stated verbatim.

72.    The Debtor owns and has the right to possess the home located at 185 Treadstone Overlook Suwanee, Georgia 30024, the Residence, at the time of the wrongful conversion.

73.    Mr. Kwak intentionally interfered with the Debtor's personal property by tricking the Debtor into signing over her house to his wife through a limited warranty deed.

74.    Mr. and Mrs. Kwak's interference deprived the Debtor of ownership of her home.

75.    Despite the demand from the Debtor, the Kwaks have refused to return the Residence back to the Debtor.

76.    The transfer caused damages to the Debtor.

77.    Based upon such conversion of her property, Debtor is entitled to the return of her home and compensatory damages in an amount to be determined at trial, plus punitive damages in an amount to be determined at trial.

## <u>COUNT SIX-CONSPIRACY</u>

78.    Plaintiff adopts Paragraphs 1 through 77 of the Complaint herein as if they were stated verbatim.

79.    Defendants Paul Kwak, Michelle Kwak, NSEW, and PPM (collectively, the "Conspirators") made numerous promises to Plaintiff between August 2018 and March 2019 that the services being provided would ultimately lead to Plaintiff creating extraordinary wealth through her companies and that all consulting being provided was for her own benefit, despite the

Conspirators' knowledge that the representations were false when made.

80.    The Conspirators knowingly and intentionally acted in concert to induce Plaintiff to continue to pay for consulting services not being rendered, pay rent for a building that Plaintiff could not occupy nor produce revenue, pay for an interest in a building she would never receive, and trick Plaintiff into signing over her home in a warranty deed to Conspirators for their benefit.

81.    Plaintiff actually and reasonably relied on the Conspirators' promises and representations. The Conspirators' actions, which constitute fraud, fraudulent transfer, preference, conversion, and breach of fiduciary duty, caused actual harm to Plaintiff.

82.    As a direct result of the Defendants' conspiracy, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT SEVEN- PUNITIVE DAMAGES

83.    Plaintiff adopts Paragraphs 1 through 82 of the Complaint as if they were stated verbatim.

84.    The actions of Defendants showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to the consequences suffered by Debtor.

85.    As a result of the actions of Defendants, Debtor is entitled to recover punitive damages, from the Defendants, in an amount to be determined at trial.

## COUNT EIGHT- COSTS OF LITIGATION

86.    Plaintiff adopts Paragraphs 1 through 85 of the Complaint as if they were stated verbatim.

87.    Defendants have acted in bad faith, been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense. For these reasons, Plaintiff is entitled to recover her

expenses of litigation, including Plaintiff's reasonable attorneys fees from the Defendant.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff prays for the following relief:

(a) That a summons and process be issued upon terms at law;

(b) Pursuant to Count One, the Court enter a judgment voiding the transfers from Debtor to Defendants and enter a judgment in favor of Plaintiff and against Debtor in an amount to be determined at the trial of this matter;

(c) Pursuant to Counts Two and Three herein, the Court enter a judgment in favor of Plaintiff and against Defendants in an amount to be proven with more certainty at the trial of this matter;

(d) Pursuant to Count Four, the Court enter a judgment in favor of Plaintiff and against Defendants in an amount to be proven with more certainty at the trial of this matter;

(e) Pursuant to Count Five, the Court enter a judgment in favor of Plaintiff and against Defendants for compensatory damages in an amount to be determined at trial, plus punitive damages in an amount to be determined at trial.

(f) Pursuant to Count Six, the Court enter a judgment in favor of Plaintiff and against Defendant in an amount to be shown at trial, plus attorney's fees, plus punitive damages.

(g) The Court enter a judgment in favor of Plaintiff and against Defendant for punitive damages for Defendants' willful and malicious conduct;

(h) The Court enter a judgment in favor of Plaintiff and against Defendants awarding Plaintiff all litigation expenses including Plaintiff's reasonable attorneys' fees;

(i) All costs be cast upon Defendants; and

(j)  Such other and further relief to Debtor as this Court deems just and proper.

Respectfully submitted this 3rd day of July, 2019.

**JONES & WALDEN, LLC**
_/s/ Cameron M. McCord_
Cameron M. McCord
Georgia Bar No. 143065
Attorneys for Plaintiff
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
(404) 546-9301 (fax)
cmccord@joneswalden.com

# EXHIBIT A



# EXHIBIT B

# COMMERICAL LEASE AGREEMENT
## (Single-Tenant Facilities)

**2018 Printing**

In consideration of the mutual covenants set forth herein, this Lease (hereafter the term "Lease" and "Agreement" are used interchangeably) is entered into this date of **August 29, 2018**  between **NSEW GA, INC,**  (hereinafter "Landlord") and **VENUS SKIN CARE LLC/SUN MI NICHOLS,** (hereinafter "Tenant") Landlord leases to Tenant, and Tenant leases from Landlord, the Property with the following address: __**3625 Savannah PL DR STE 101, Duluth, GA 30096**_
TAXPIN/ID#  _____and as more particularly described in the Legal Description Paragraph below:

**Legal Description.** The Full legal description of the Property is:
*[Select A, B, or C below. The sections not marked shall not be a part of this Agreement.]*
☐ **A.**  attached as an exhibit hereto;
☐ **B.**  Identical to the legal description for the property contained in the deed recorded in Deed Book _____, Page _____,
Et. Seq., _____ County, Georgia records;
☐ **C.**  described below:
Land Lot(s) _____ of the _____ District, _____ Section/GMD, Lot
_____, Block _____, Unit _____, Phase/Section _____
Of _____ Subdivision/Development,
_____ County, Georgia according to the plat recorded in
Plat Book _____, Page _____, et. Seq., _____ County, Georgia records.

1. **Term.** The initial term of this Lease shall be on  **FIVE YEARS**  beginning on the earlier of the completion of the work described in any attached work letter or the date **September 01, 2018** ("Commencement Date"), through and including the date of **August 31, 2023.**

2. **Possession.**  If Landlord is unable to deliver possession of Premises on the Commencement Date, rent shall be abated on a daily basis until possession is granted. If possession is not granted within fourteen (14) days of the Commencement Date, Tenant may terminate this Lease in which event Landlord shall promptly refund all payments and deposits to Tenant. Landlord shall not be liable for delays in the delivery of possession of possession to Tenant.

3. **Rent.**  Tenant shall pay base rent to Landlord without demand, deduction, or setoff in advance in the sum of **Two Thousand Dollars ($2,000.00)** per month on the first day of each month during the term of the Lease or any renewals thereof, at the following address: **3625 Savannah PL DR STE 101. Duluth, GA 30096.**

(or at such other address as may be designated from time to time by Landlord in writing). If the Commencement Date begins on   the second day through the last day of any month, the rent shall be prorated for that portion of the month and shall be paid at the time of leasing Property. Tenant shall also pay additional rent as may be provided elsewhere in this Lease. Such additional rent shall be paid in the same manner as the base rent.

4. **Late Payment; Service Charge for Returned Checks.** Rent not paid in full by the fifth day of the month shall be late. Landlord shall have no obligation to accept any rent not received by the __Fifth__ of the month. If late payment is made and Landlord accepts the same, the payment must be in the form of cash, cashier's check , certified check or money order and must include an additional rent amount of $100.00__, and if applicable, a service charge for any returned check of $50_ . Landlord reserves the right, upon notice to Tenant, to refuse to accept personal checks from Tenant after one or more of Tenant's personal checks have been returned by the bank unpaid.

5. **Security Deposit.**
   **A.  Security Deposit to be Held by Landlord or Broker:** *[Check one. The section not marked shall not be a part of this Agreement.]*
   ☑ Landlord Holding Security Deposit.
   (1)  Tenant has paid to Landlord as security for Tenant's fulfillment of the conditions of this Lease a security deposit of **Two Thousand Five Hundred Dollars**  in ☐ cash, ☐ money order and/or ☑ check ("Security Deposit").
   (2)  Landlord shall deposit the Security Deposit in Landlord's general account with Landlord retaining the interest if the account is interest bearing. Tenant acknowledges and agrees that Landlord shall have the right to sue such funds for whatever purpose Landlord sees fit, and such funds will not be segregated or set apart in any manner.
   (3)  Tenant recognizes and accepts the risk of depositing the Security Deposit with Landlord. Tenant acknowledges that Tenant has not relied upon the advise of any Broker in deciding to pay such Security Deposit to Landlord. Landlord and Tenant acknowledge and agree that:
      (a)  Broker has no responsibility for, or control over, any Security Deposit deposited with Landlord;
      (b)  Broker has no ability or obligation to insure that the Security Deposit is properly applied or deposited;
      (c)  The disposition of the Security Deposit is the sole responsibility of Landlord and Tenant as herein provided; and
      (d)  Landlord and Tenant agree to indemnify and hold harmless Broker and Broker's affiliated licensees against all

Copyright© 2011 by Georgia Association of REALTORS®, Inc.

claims, damages, losses, expenses or liability arising from the handling of the Security Deposit by a Landlord.

(4) Landlord shall return Security Deposit to Tenant, after deducting any sum which Tenant owes Landlord hereunder, or any sum which Landlord may expend to repair arising out of or related to Tenants occupancy hereunder, abandonment of Property or default in this Lease (provided Landlord attempts to mitigate such actual damages), including but not limited to any repair, replacement cleaning or painting of Property reasonably necessary due to the negligence, carelessness, accident, or abuse of Tenant or Tenants employees, agents, invitees, guests, or licensees. In the event Landlord elects to retain any part of the Security Deposit, Landlord shall promptly provide Tenant with a written statement setting forth the reasons for the retention of any portion of the Security Deposit, including the damages for which any portion of the Security Deposit is retained, The use and application of the Security Deposit by Landlord shall be at the discretion of the Landlord. Appropriation by Landlord of all or part of the Security Deposit shall not be an exclusive remedy for Landlord, but shall be cumulative, and in addition to all remedies of Landlord at law or under this Lease. The Tenant may not apply the Security Deposit to any rent payment

☐ **Broker Holding Security Deposit.**

(1) Tenant has paid to Broker as security for Tenant's fulfillment of the conditions of this Lease ("Security Deposit")
$_____ N/A_____
Dollars in ☐ cash, ☐ money order and/or ☐ check.

(2) The Broker shall deposit the Security Deposit in Brokers escrow/trust account (with Broker retaining the interest if the account is interest bearing) within five (5) banking days from the Binding Agreement Date.

(3) Broker shall disburse the Security Deposit only as follows: (a) upon the failure of the parties to enter into a binding lease; (b) upon a subsequent written agreement signed by all parties having an interest in the funds; (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the security deposit; (d) upon a reasonable interpretation of this Agreement by Broker; (e) as provided in the General Provisions section below of this Paragraph; or (f) upon the termination of the agency relationship between Landlord and Broker, in which event Broker shall only disburse the Security Deposit, to another licensed Georgia Real Estate Broker selected by Landlord unless otherwise agreed to in writing by Landlord and Tenant after notice to Broker and Tenant. Prior to disbursing the Security Deposit pursuant to a reasonable interpretation of this Agreement; Broker shall give all parties fifteen (15) days notice stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Broker prior to the end of the fifteen (15) day notice period. All objections not raised in a timely manner, shall be waived. In the event a timely objection is made, Broker shall consider the objection and shall do any or a combination of the following: (a) hold the Security Deposit for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the Security Deposit and so notify all parties; and/or (c) interplead the Security Deposit into a court of competent jurisdiction Broker shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Broker. No party shall seek damages from Broker (nor shall Broker be liable for the same) for any matter arising out of or related to the performance of Broker's duties under this Security Deposit paragraph.

B. **General Provisions Regarding Security Deposit:**

(1) In the event any Security Deposit check is not honored, for any reason, by the bank upon which it is drawn, the holder thereof shall promptly notify the other parties and Broker(s) to this Lease. Tenant shall have three (3) banking days after notice to deliver good funds to the holder. In the event Tenant does not timely deliver good funds to the holder, the Landlord shall have the right to terminate this Agreement upon written notice to the Tenant.

(2) The entire Security Deposit, if held by Landlord, will be returned to Tenant within thirty (30) days after Property is vacated if:
    (a) The term of the Lease has expired or the Lease has been terminated in writing by the mutual consent of both parties;
    (b) All monies due under this Lease by Tenant have been paid;
    (c) Property is not damaged and is left in its original condition, normal wear and tear excepted;
    (d) All keys have been returned; and
    (e) Tenant is not in default under any of the terms of this Lease.

6. **Repairs and Maintenance.** Tenant acknowledges that Tenant has inspected Property and that it is fit for its stated use. Tenant agrees that no representations regarding Property or the condition thereof and no promises to alter decorate, improve, or repairs have been made by Landlord, Broker, or their agents unless specified in this Lease. The following shall be kept in good working order and repair, normal wear and tear expected, by either the Landlord or Tenant as follows:
*[Check all that apply. The sections not marked shall not be a part of this Agreement]*

| | TENANT | LANDLORD | | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Heating System | ☐ | ☑ | Elevators | ☐ | ☐ |
| Plumbing System | ☐ | ☑ | Air conditioning system | ☐ | ☑ |
| Parking area | ☐ | ☑ | Electrical system/fixtures | ☑ | ☐ |
| Driveway | ☐ | ☑ | Exterior walkways | ☐ | ☑ |
| Building Exteriors | ☐ | ☑ | Interior hallways | ☑ | ☐ |
| Smoke Detector | ☑ | ☐ | Lobby | ☑ | ☐ |
| Terrace/patio | ☐ | ☑ | Loading area | ☐ | ☑ |
| Restrooms | ☑ | ☐ | Trash facilities | ☑ | ☐ |
| Stairs | ☐ | ☑ | Landscaping | ☐ | ☑ |
| Exterior Windows | ☑ | ☐ | Other _____ | ☐ | ☑ |
| Security Alarm | ☑ | ☐ | Other _____ | ☐ | ☐ |

Any item not mentioned herein but existing on Property (other than furniture, fixtures and equipment of Tenant shall be maintained

by Landlord ☐  OR Tenant ☑  *[Check one. The box not marked shall not be a part of this Agreement.]*
Upon receipt of written notice from Tenant, Landlord shall, within a reasonable time period thereafter, repair all defects in those facilities and systems that are the responsibility of landlord to maintain in good working order and repair. If Tenant does not promptly perform its maintenance and repair obligations as set forth herein, Landlord may make such repairs and/or replacements and Tenant shall promptly pay the costs of the same. Landlord shall not be liable to Tenant for any damage caused by any of the above reference systems or facilities of by water coming through or around the roof or any door, flashing, skylight vent, window, or the like in or about Property, except if such damage is due to the gross negligence or willful misconduct of Landlord. Tenant shall be responsible for the reasonable cost of repairs made necessary by the negligence or willful misconduct of Tenant (including Tenant's employees, agents, invitees, guests, or licensees).

7.  **Services.** Landlord shall provide, at Landlords expense the following services *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*
    ☐ General cleaning and janitorial service of the interior of Property times per week
    ☐ Concierge service as follows:
    ☐ Parking attendant as follows: _____ .
    ☐ Property monitor as follows: _____
    ☐ Trash collection service _____ times per week
    ☐ Soap, paper towels, and toilet tissue for rest rooms _____ times per week
    ☐ Replacement of all light bulbs and repair and maintenance of all light fixtures located in the interior of Property.
    ☐ Other _____ .
    Landlord shall not be liable for the nonperformance or inadequate performance of such services by third parties. Tenant shall be responsible for the costs and provision of any services that Landlord has not expressly agreed to pay for in this Lease. Tenant agrees to provide services not provided by Landlord that are necessary to keep Property in good order, condition, and repair, normal wear and tear excepted. If Tenant does not provide such services, Landlord may then provide such services and Tenant shall promptly pay Landlord the costs for such services.

8.  **Utilities.** The services and/or utilities set forth below serving Property shall be paid by either the Landlord or Tenant as follows: *[Check all that apply. The sections not marked shall not be a part of this Agreement]*

    | UTILITY | TENANT | LANDLORD | UTILITY | TENANT | LANDLORD |
    |---|---|---|---|---|---|
    | Water | ☑ | ☐ | Sewer | ☐ | ☑ |
    | Electricity | ☑ | ☐ | Natural Gas | ☑ | ☑ |
    | Garbage | ☐ | ☑ | Cable Television | ☑ | ☐ |
    | Telephone | ☑ | ☐ | Digital Subscriber Line ☑ | | ☐ |
    | Other _____ | ☐ | ☐ | Other _____ | ☐ | ☐ |

    Tenant shall be responsible for the costs of any utilities that Landlord has not expressly agreed to pay for in this Lease. Tenant must provide proof of payment of final bills for all utilities or service termination (cutoff) slips. Landlord may  at Landlord's option pay utilities and be reimbursed by Tenant along with the next month's rent. Landlord shall not be liable for any interruptions or delays in the provision of utility services unless such interruptions or delays shall be caused by Landlords gross negligence or willful misconduct.

9.  **Renewal Term.** Either party may terminate this Lease at the end of the term by giving the other party sixty (60) days written notice prior tot he end of the term. If neither party gives notice of termination, the Lease will automatically be extended on a month-to-month basis with all terms remaining the same except that Landlord reserves the right to increase the amount of rent upon delivery of written notice to Tenant sixty (60) days prior to the effective date of any increase. Thereafter, Tenant may terminate this Lease upon sixty (60) days written notice to Landlord and Landlord may terminate this Lease upon sixty (60) days written notice to Tenant.

10. **Sublet and Assignment.** Tenant may not sublet Property in whole or in part or assign this Lease without the prior written consent of Landlord. This Lease shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord and this Lease shall create a usufruct only. In the event Landlord shall assign this Lease, the assignee thereof shall be responsible to timely pay Brokers all commissions and other sums owed to them hereunder.

11. **Right of Access, Signage.**
    A.  Landlord and Landlord's agents shall have the right of access to Property for inspection, repairs and maintenance during reasonable hours. In the case of emergency, Landlord may enter Property at any time to protect life and prevent damage to Property. Landlord And/or Landlord's agents may place a "for rent" or 'for sale" sign on the interior or exterior of Property, and may show Property to prospective tenants or purchasers during reasonable hours. Tenant agrees to cooperate with Landlords, Landlords agent and Brokers who may show Property to prospective Tenants. Tenant shall secure valuables and agrees to hold Landlord and/or Landlords Agent harmless for any loss thereof. For each occasion where the access rights described above are denied. Tenant shall pay Landlord the sum of $300.00 as liquidated damages; it being acknowledged that Landlord shall be damaged by the denial of access, that Landlords actual damages are hard to estimate, and that the above amount represents a reasonable pre-estimate of Landlord's damages rather than a penalty.
    B.  Without Landlords prior written permission, Tenant shall not place any sign, advertising matter, or any other things of any kind on any part of the outside walls or roof of Property or on any part of the interior of Property that is visible from the exterior of Property. Tenant shall maintain all such permitted signs, advertising matter, or any other things of any kind in good condition and repair. Tenant agrees to remove at its cost all such permitted signs, advertising matter, or any other things of any kind at the end of this Lease.

**12. Use.** Property shall only be used for the purposes set out as follows:  SKIN CARE & BEAUTY FACIAL SALONS.
Property shall be used so as to comply with all federal, state, county, and municipal laws and ordinances and any applicable rules and regulations. Tenant shall not use or permit Property to be used for any disorderly or unlawful purpose; nor shall Tenant engage in any activity on Property which would endanger the health and safety of other Tenants or which otherwise creates a nuisance

**13.** <u>Agency and Brokerage.</u>
   A. **Agency Disclosure:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and where the context would indicate the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Tenant or Landlord greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;

1. **No Agency Relationship.** Tenant and Landlord acknowledge that, it they are not represented by a Broker, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
2. **Listing Broker.** Broker working with the Landlord is identified on the signature page as the "Listing Broker": and said Broker is ☐ OR is not ☐ representing Landlord;
3. **Leasing Broker.** Broker working with Tenant (including in transactions where Broker is representing Landlord) is identified on the signature page as "Leasing Broker" and said Broker is ☐ OR is not ☐ representing Tenant; and
4. **Dual Agency or Designated Agency.** If Tenant and Landlord are both being represented by the same Broker, a relationship of either designated agency ☐OR dual agency ☐ shall exist.
   a. **Dual Agency Disclosure.** *[Applicable only if dual agency has been selected above]*
      Tenant and Landlord are aware that Broker is acting as a dual agent in this transaction and consent to the same. Tenant and Landlord have been advised that:
      (1) In serving as a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;
      (2) Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;
      (3) Tenant and Landlord do not have to consent to dual agency and, the consent of Tenant and Landlord to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.
      (4) Notwithstanding any provision to the contrary contained herein, Tenant and Landlord each hereby direct Broker while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.
   b. **Designated Agency Assignment:** *[Applicable only if the designated agency has been selected above.]*
      Broker has assigned_____N/A_____ to work exclusively with Tenant as Tenant's designated agent and _____N/A_____ to work exclusively with Owner/Landlord as Owner/Landlords designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.
   B. **Material Relationship Disclosure:** The Broker and/or affiliated licensees have no material relationship with either client except as follows:_____. (A material relationship means one actually known of a personal, familial or business nature between the Broker and/or affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)
   C. **Brokerage:** The Brokers listed below have performed a valuable service in this transaction and are made parties hereunder to enforce their commission rights. Payment of commission to a Broker shall not create an agency or subagency relationship between Leasing Broker and either Landlord or Landlords Broker. Landlord agrees to pay the Broker listed below and representing Landlord to lease and/or manage Property ("Listing Broker") a commission (which commission has already been negotiated in a separate agreement) of *[Check one. The section not marked shall not be a part of this Agreement]:*
      ☐ $_____ or _____percent (%) of the total base rent to be paid under the Lease, which shall be due and payable upon occupancy.
      ☐ $_____ or _____percent (%) of base rents paid, which shall be due and payable upon Tenant's monthly payment of rent in the manner provided in the Rent Paragraph above.
   In the event the Lease is made in cooperation with another Broker listed below as the Leasing Broker, the Listing Broker shall receive percent (%) of the total real estate commission paid hereunder and the Leasing Broker shall receive percent (%) of the total real estate commission paid hereunder  In the event Tenant and/or Landlord fail or refuse to perform any of their obligations herein, the non-performing party shall immediately pay the Listing Broker and the Leasing Broker their full commissions. The Listing Broker and Leasing Broker may jointly or independently pursue the non-performing party for that portion of the commission, which they would have otherwise received under the Lease.

**14.** <u>Default.</u>
   A. If Tenant defaults under any term, condition or provision of this Lease, including, but not limited to, failure to pay rent or failure to reimburse Landlord for any damages, repairs or costs when due, Landlord shall have the right to terminate this Lease by giving written notice to Tenant and accelerate all remaining payments that Tenant is required to pay under this Lease. These payments shall be due and payable fifteen (15) days after Tenant receives the aforementioned notice. Landlord and Tenant acknowledge that Landlord shall be damaged by Tenants default, that Landlords actual damages are hard to estimate, and that the above amount represents a reasonable pre-estimate of Landlords damages rather than a penalty. If Landlord accelerates as provided in this subparagraph, it shall seek another tenant for Property and credit any amounts received to the Tenant, less the following:
      (1) reimbursement for all expenses incurred as a result of Tenants failure to perform its obligations under the Lease;
      (2) the costs of securing another tenant, including, but not limited to, advertising and brokerage commissions; and

(3) the costs of altering. dividing, painting, repairing, and replacing Property to accommodate a new tenant. Landlords rights expressed herein are cumulative of any and all other rights expressed in this Lease. Tenant shall remain liable for rents from and after any action by Landlord under a proceeding against Tenant for holding over or distress warrant, whether or not Tenant retains the right to possession of Property.

**B.** If Tenant abandons Property or violates any of the Rules and Regulations set forth herein, or otherwise fails to abide by and perform any of the obligations, terms, conditions or provisions of this Lease, each and any such breach shall constitute a default under this Lease. If any such default continues for ten (10) calendar days after Landlord delivers written notice of said default to Tenant, Landlord may, at his option, terminate this Lease by delivering written notice thereof to Tenant and pursue the remedy described herein.

**C.** All rights and remedies available to Landlord by law or in this Lease shall be cumulative and concurrent Rules and Regulations.

## 15. Rules and Regulations.

**A.** Tenant is prohibited from adding, changing or in any way altering locks installed on the doors of Property without prior written permission of Landlord. If all keys to Property are not returned when Tenant vacates Property, Landlord may charge a re-key charge in the amount of $300.00_____.

**B.** Motor vehicles with expired or missing license plates, non-operative vehicles, boats, trailers, Rvs and campers are not permitted on Property. Any such vehicle may be removed by Landlord at the expense of Tenant, for storage or for public or private sale, at Landlords option, and Tenant shall have no right or recourse against Landlord thereafter.

**C.** No goods or materials of any kind or description, which are combustible or would increase fire risk shall be kept in or placed on Property except for goods and materials typically found in a general office use provided that the same are limited in quantity to that normally found in such use).

**D.** No nails, screws or adhesive hangers except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of Property

**E.** Tenant shall not place any objects or personal property on Property in a manner that is inconsistent with the load limits of Property. Tenant shall consult Landlord before placing any heavy furniture, file cabinets, or other equipment in Property.

**F.** Landlord shall provide heating and air conditioning to Property between ___a.m. and ___ p.m., Monday to Friday (excluding public holidays); between ___a.m. and ___ p.m., Saturday; and between ___a.m. and___ p.mn., Sunday, Tenant shall notify Landlord by 4 p.m. of the preceding day of any requests for overtime heating and air conditioning. Landlord may charge Tenant its reasonable costs of providing such overtime heating and air conditioning.

**G.** Tenant shall not, without Landlord's prior written consent, use any equipment which uses electric current in excess of 110 volts, which will increase the amount of electricity ordinarily furnished for use of Property as general office space, or which require clean circuits or other distribution circuits.

**H.** Landlord may establish additional reasonable Rules and Regulations concerning the maintenance, use, and operation of Property. Amendments and additions to the Rules and Regulations shall be effective upon delivery of a copy thereof to Tenant.

## 16. Abandonment. If Tenant removes or attempts to remove personal property from Property other than in the usual course of continuing occupancy, without having first paid Landlord all monies due, Property may be considered abandoned, and Landlord shall have the right, without notice, to store or dispose of any personal property left on Property by Tenant. Landlord shall also have the right to store or dispose of any of Tenants personal property remaining on Property after the termination of this Lease. Any such personal property shall become Landlord's personal property.

## 17. Estoppel Certificate. Tenant shall, from time to time, upon Landlords request execute, acknowledge, and deliver to Landlord, within ten days of such request, a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or if there has been modification thereof, that the same is in full force and effect as modified and stating the nature thereof), (b) that to the best of its knowledge there are no uncured defects on the part of the Landlord for if any such defaults exist, a specific description thereof; (c) the date to which any rents or other charges have been paid in advance; and (d) any other reasonable matters requested by Landlord. Landlord and any prospective purchaser or transferee of Landlords interest hereunder or any then existing or prospective mortgagee or grantee of any deed to secure debt may rely on such certificates.

## 18. Property Loss. Storage of personal property by Tenant shall be at Tenants risk and Landlord shall not be responsible for any loss or damage. Tenant shall be responsible to insure Tenants personal property against loss or damage. Landlord shall not be responsible or any damage to Tenants property, unless such damage is caused by Landlord's gross negligence or willful misconduct.

## 19. Destruction of Property:

**A.** If earthquake, fire, storm, or other casualty shall totally destroy (or so substantially damage as to be untenable) Property, rent shall abate from the date of such destruction. Landlord shall have sixty (60) days to commence the restoration of Property to a tenable condition. If in Landlords sole discretion restoration cannot be completed within 180 days following such destruction, Landlord may, by written notice furnished to Tenant within thirty (30) days of such destruction, terminate this Lease, whereupon rent and all other obligations hereunder shall be adjusted between the parties as of date of such destruction. In the event the Landlord elects to complete such restoration, but fails to do so within 180 days following such destruction, this Lease may be terminated as of the date of such destruction upon written notice from either party to the other given not more than ten (10) days following expiration of said 180 day period, If such notice is not given, then this Lease shall remain in force and rent shall commence upon delivery of Property to Tenant in a tenable condition.

**B.** If Property is damaged but not rendered wholly untenable by earthquake, fire, storm, or other casualty, rent shall abate in such proportion as Property have been damaged and Landlord shall restore Property as reasonably quickly as practicable whereupon full rent shall commence,

C. Rent shall not abate nor shall Tenant be entitled to terminate this Lease if the damage or destruction of Property, whether total or partial, is the result of the negligence of Tenants, its contractors, employees, agents, invitees, guests, or licensees.

20. **Alteration and Improvements.** Tenant shall not make or allow to be made any alterations, physical additions, or improvements in or to Property without first obtaining Landlords prior written consent. Landlord may grant or withhold such consent within its reasonable discretion and may impose reasonable conditions upon its consent. All costs of any such alteration, addition, or improvement shall be borne by Tenant, unless otherwise agreed in writing. The provisions of the Work Letter, attached hereto as an Exhibit and a part of this Lease, shall govern any alterations or improvements to be performed prior to the Commencement Date of this Lease.

21. **Insurance.** Tenant agrees that during the term of the Lease, Tenant will carry and maintain, at its sole cost, the following types of insurance, in the amounts specified and in the form hereinafter provided for *[Check all that apply. The sections not marked shall not be a part of this Agreement]:*

☐**A. General Commercial Liability Insurance for reasonable equivalent thereto):** Such insurance shall cover Property and Tenant's use thereof against claims for personal injury, bodily injury or death, property damage and products liability occurring upon, in, or about Property. The limits of such policy shall be in such amounts as Landlord may from time to time reasonably require, but in any event not less than _One Million_ Dollars ($1,000,000.00) for each occurrence. Such insurance shall be endorsed to cover independent contractors and contractual liability. Such insurance shall extend to any liability of Tenant arising out of the indemnities provided for in this Lease.

☐**B. Fire and Extended Coverage Insurance (or reasonable equivalent thereto):** Such insurance shall cover Tenants interest in its improvements to Property, and all furniture, equipment, supplies, and other property owned, leased, held or possessed by it and contained therein. Such insurance shall coverage shall be in an amount equal to not less than _____ 50_____ percent (%) of full replacement costs updated from time to time during the term of the Lease. Tenant shall promptly provide Landlord written notice in the event of any damages to persons or property occurring on Property from fire, accident, or any other casualty.

☐**C. Workers' Compensation Insurance (or reasonable equivalent thereto):** Such insurance shall include coverage as required by applicable law.

☐**D. Contractors Insurance (or reasonable equivalent thereto):** If Tenant engages any contractor or subcontractor to construct improvements or perform any other work on Property, Tenant shall require that such contractor or subcontractor have in force commercial general liability insurance, including personal injury coverage, contractual liability coverage, completed operations coverage, property damage endorsement, and, for any work which is subcontracted, contractors' protective liability coverage, insuring against any and all liability for injury to or death of a person or persons and for damage to property occasioned by or arising out of such work. The limits of such policy for both damage to property and bodily injury to be in such amounts as Landlord may from time to time reasonably require, but in any event not less than _____ Dollars ($_____) for each occurrence. Any such contractor or subcontractor shall also be required to maintain workers' compensation insurance as required by applicable law. All insurance policies procured and maintained herein (other than workers' compensation insurance) shall name Landlord, Landlords property manager(s), Landlords brokers and Landlords lender as additional insureds, shall be carried with insurance companies licensed to do business in the State of Georgia and having a current financial strength rating in Best's Ratings of not less than B+. Such policies shall be non-cancellable and may not be materially altered except after thirty (30) days notice to Landlord. Such insurance policies or, at Landlords election, duly executed certificates of such policies, accompanied by proof of the premium for such insurance, shall be delivered to Landlord before the earlier of (a) the initial entry by Landlord upon Property for the installation of its equipment or improvements; or (b) the Commencement Date of the Lease. Certificates of renewal of such insurance or copies of any replacement insurance policies, accompanied by proof of payment of the premiums for such insurance, shall be delivered to Landlord at least ten (10) days before the expiration of each respective policy term. Tenant shall comply with all rules and regulations applicable to Property issued by the Board of Fire Underwriters or by anybody hereinafter constituted exercising similar functions. Tenant shall not intentionally do anything, or permit anything to be done, on or about Property that might adversely affect, contravene, or impair any policies of insurance that are in force for Property or any part thereof. Tenant shall pay all costs, damages, expenses, claims, fines, or penalties incurred by Landlord or Tenant because of Tenant's failure to comply with this Paragraph. Tenant indemnifies Landlord from all liability with reference thereto.

22. **Taxes.** Tenant shall pay any and all taxes (including assessments and license fees) assessed or imposed upon Tenants fixtures furniture, appliances, and personal property located in Property. *[Check one. The section not marked shall not be a part of Agreement.]*

☑**A. Landlord Pays All Property Taxes:** Landlord shall pay all property taxes levied against Property. Tenant shall not pay any property taxes levied against Property.

☑**B. Tenant Pays Increases in Property Taxes:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional rent its Percentage Share of the amount by which all property taxes on the Premises for each tax year exceed property taxes on Property for the tax year _2018_ .On or before the first day of the term of this Lease. Landlord will provide Tenant written notice of Landlords estimate of the additional rent payable under this subparagraph. During December of each calendar year or as soon as practicable, Landlord will give Tenant written notice of its estimate of the payments to be made for the ensuing calendar year. On the first day of each month during the term of the Lease, Tenant will pay one-twelfth of the estimated amount in the manner provided in the Rent Paragraph. If notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after the notice is given. Within ninety (90) days after the close of each calendar year or as soon as practicable thereafter, Landlord will deliver to Tenant (1) a statement of property taxes for the calendar year certified by certified public accountants designated by Landlord; and (2) a statement of the payments made or to be made for the calendar year that has been prepared on the basis of the certified statement. If on the basis of those statements, Tenant owes an amount that is less than the estimated payments for the calendar year previously made by the Tenant, Landlord will pay Tenant the amount of the overpayment within thirty (30) days after delivery of those statements. If on the basis of those statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the

Copyright© 2011 by Georgia Association of REALTORS®, Inc.     CF9, Commercial Lease Agreement (Single-Tenant Facilities), Page 5 of 10, 7/3/713

deficiency to Landlord within thirty (30) days after delivery of those statements. If the Lease commences on a day other than the first day of the calendar year or ends on a day other than the last day of a calendar year, the amounts payable under this subparagraph shall be prorated.

23. **Sale of Property to Tenant:** Landlord shall pay Leasing Broker a commission in the amount of _____ percent (%) and Listing Broker a commission in the amount of _____ percent (%) of the gross sales price at closing if Tenant acquires from Landlord title to Property or any part thereof or any property as an addition, expansion, or substitution for Property during the term of this Lease, any renewals thereof, or within one year after the expiration of this Lease. Such commission shall be payable in lieu of any further commission which otherwise Broker would have been due under this Lease. Notwithstanding the above, Owner shall immediately give notice to Broker if and when: (a) Owner enters into a contract to sell Property; or (b) Owner closes on the sale of Property to another.

24. **Condemnation.** If all or any part of Property are taken or appropriated by any public or quasi-public authority under the power of eminent domain, and if the remaining portion of Property is thereby rendered untenable or unusable for the purposes herein stated, this Lease shall terminate when the condemning authority takes possession, and any rent paid for any period beyond possession by the condemning authority shall be repaid to Tenant. Landlord shall receive the entire condemnation award without deduction there from for any interest of Tenant in Property, but Tenant shall have the right to make a separate claim with the condemning authority for, and to receive therefore, (a) any moving expenses incurred by Tenant as a result of such condemnation; (b) any costs incurred or paid by Tenant in connection with any alteration or improvement made by Tenant to Property; (c) the value of Tenants personal property taken; (d) Tenants loss of business income; and (e) any other separate claim which Tenant may be permitted to make under applicable law, provided that such other separate claims shall not reduce or adversely affect the amount of Landlord's award.

25. **Disclaimer.** Tenant and Landlord acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Tenant and Landlord agree that Brokers shall not be responsible to advise Tenant on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of Property; the condition of Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to Property; mold; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of Property; any conditions existing of Property which may affect Property; the terms, conditions and availability of financing; and the uses and zoning of Property whether permitted or proposed. Tenant acknowledges that Broker is not an expert with respect to the above matters and that, if any of these matters or any other matters are of concern, Tenant should seek independent expert advice relative thereto. Tenant acknowledges that Broker shall not be responsible to monitor or supervise any portion of any construction or repairs to Property and that such tasks clearly fall outside the scope of real estate brokerage services.

26. **Other Provisions.**
   A. **Time of Essence:** Time is of the essence of this Lease.
   B. **No Wavier:** Any failure of Landlord to insist upon the strict and prompt performance of any covenants or conditions of this Lease or any of the rules and regulations set forth herein shall not operate as a waiver of any such violation or of Landlord's right to insist on prompt compliance in the future of such covenant or condition, and shall not prevent a subsequent action by Landlord for any such violation. No provision, Covenant or condition of this Lease may be waived by Landlord unless such waiver is in writing and signed by Landlord.
   C. **Definitions.** "Landlord" as used in this Lease shall include its representatives, heirs, agents, assigns, and successors in title to Property. Broker shall be considered the authorized agent of Landlord except to the extent specifically provided for herein. The terms "Landlord" and "Tenant" shall include singular and plural, and corporations, partnerships, companies or individuals, as may fit the particular circumstances. The term "Binding Agreement Date" shall mean the date that this Lease has been signed by the Tenant and Landlord and a fully signed and executed copy thereof has been returned to the party making the offer to lease. "Property taxes" means any form of real or personal property taxes, assessments, special assessments, fees, charges, levies, penalties, service payments in lieu of taxes, excises, assessments, and charges for transit, housing, or any other purposes, impositions or taxes of every kind and nature whatsoever, assessed or levied by any authority having the power to tax against Property or any legal or equitable interest of Landlord in Property, whether imposed now or in the future excepting only taxes measured by the net income of Landlord from all sources.
   D. **Entire Agreement:** This Lease and any attached addenda constitute the entire Agreement between the parties and no oral statement or amendment not reduced to writing and signed by both parties shall be binding.\
   E. **Attorney's Fees and Costs of Collection:** Whenever any sums due hereunder are collected by law, or by attorney at law to prosecute such an action, then both parties agree that the prevailing party will be entitled to reasonable attorney's fees, plus all costs of collection.
   F. **Indemnification:** Tenant agrees to indemnify and hold harmless Landlord and Broker against any and all injuries, damages, losses, suits and claims against Landlord and/or Broker arising out of or related to: (1) Tenant's failure to fulfill any condition of this Lease; (2) any damage or injury happening in onto Property or to any improvements thereon as a result of the acts or omissions of Tenant or Tenant's family members, invitees or licensees; (3) Tenant's failure to comply with any requirements imposed by any governmental authority; (4) any judgment, lien or other encumbrance filed against Property as a result of Tenant's actions and any damage or injury happening in or about Property to Tenant or Tenant's family members, invitees or licensees (except if such damage or injury is caused by the intentional wrongful acts of Landlord or Broker) and Tenant covenants not to sue Landlord or Broker with respect to any of these matters. For the purpose of this paragraph, the term "Broker" shall include Broker and Brokers affiliated licensees and employees.
   G. **No Partnership:** Tenant by execution of this Lease is not a partner of Landlord in the conduct of its business or otherwise, or joint venturer, or a member of any joint enterprise with Landlord.

H. **No Recordation:** Tenant shall not record this Lease nor any short form memorandum thereof without Landlord's prior written consent.

I. **Notices:**

1. **All Notices Must Be In Writing.** All notices, including, but not limited to, offers, counteroffers, acceptances, amendments, notices to terminate and demands, required or permitted hereunder shall be in writing, signed by the party giving the notice and delivered either: (a) in person; (b) by an overnight delivery service; prepaid (c) by facsimile transmission (FAX); or (d) by the Unites States Postal Service, postage prepaid. registered or certified return receipt requested.

    ☐ *(Check here it Broker can accept notice for Landlord. if this box is not checked the paragraph below shall not be a part of this Lease.)*

2. **When Notice to Broker is Notice to Client.** Except in transactions where Broker is practicing designated agency, notice to Broker shall for all purposes be deemed to be notice to the party being represented by Broker as a client. In transactions where Broker is practicing designated agency, notice to the designated agent shall be deemed to be notice to the party being represented by the designated agent. All FAX notices to Listing Broker or Leasing Broker shall be sent to their respective FAX numbers identified on the signature page 0f this Lease. FAX notices to the designated agent for Tenant shall be sent to the FAX number of Leasing Broker. FAX notices to the designated agent for Landlord shall be sent to the FAX number of Listing Broker. Notice to Broker shall not be deemed to be Notice to any party who is only a customer of Broker.

3. **Where Notices Should be Sent.** All FAX notices to Tenant or Landlord shall be sent to the following facsimile numbers: Unrepresented Tenant:_____ ;Unrepresented Landlord: _____. Notices other than by FAX shall be sent to Tenant at the address of Property and to Landlord at the address set forth below or such other address as may be specified by Landlord in a notice to Tenant:_____.

4. **Miscellaneous.** Except as may be provided below, notices shall be deemed to be given as of the date and time they are received. The notice requirements referenced herein shall be strictly construed. Notice sent by FAX shall be deemed to be given and received as of the date and time it is transmitted provided that the sending FAX products a written confirmation showing the correct date and time of the transmission and the telephone number reference herein to which the notice should have been sent. Any notice sent by FAX shall be sent to such other Fax number as the receiving party may from time to time specify by notice to the party sending the FAX. Any party sending notice by FAX shall send an original copy of the notice if so requested by the other party. A faxed signature of a party shall constitute an original signature binding upon the party.

    J. **Governing law.** This Agreement may be signed in multiple counterparts and shall be governed by and interpreted pursuant to the laws of the State of Georgia.

27. **Exhibits.** All exhibits attached hereto, listed below or referenced herein are made a part of this Lease, if any such exhibit conflicts with any preceding paragraph, said exhibit shall control:

**SPECIAL STIPULATIONS:** All exhibits attached hereto, listed below or referenced herein are made a part of this Lease. if any such exhibit conflicts with any preceding paragraph, said exhibit shall control:

1. Landlord will deliver gas bill(50%) every month and tenant shall pay the bill on time.
2. Tenant shall pay rent schedule as below;
   *September 01, 2019 ~ August 31, 2020 ($2,500.00)
   *September 01, 2020 ~ August 31, 2023 ($3,000.00)
3. if tenant will renew the another 3yr lease term, landlord will not request to set up for original office rooms.

Additional Special Stipulations are ☐ or are ☑ not attached.

**IN WITNESS WHEREOF,** the parties hereto have set their hand and seal the day and year first written above.

| | | |
|---|---|---|
| _____ | 08/29/2018 | |
| Tenant's Signature | Date | |
| **Venus Skin Care  LLC** | | |
| Print or Type Name | | |

Landlord's Signature _____ 08/29/2018
Date

**NSEW GA, INC**
Print or Type Name

_____ 08/29/2018
Tenant's Signature | Date

Sun Mi Nichols
Print or Type Name

Landlord's Signature _____ Date

Print or Type Name

Tenant's E-Mail Address _____

Landlord's E-Mail Address _____

Tenant's E-Mail Address _____

Landlord's E-Mail Address _____

Leasing Broker _____

Listing Broker _____

MLS Office Code _____ Brokerage Firm License Number _____

MLS Office Code _____ Brokerage Firm License Number _____

Broker's Phone#_____ & FAX#_____

Broker's Phone#_____ & FAX#_____

By: _____
Broker or Broker's Affiliated Licensee

By: _____
Broker or Broker's Affiliated Licensee

Print or Type Name _____

Print or Type Name _____

Broker's or Broker's Affiliated Licensee E-Mail Address _____

Broker's or Broker's Affiliated Licensee E-Mail Address _____

Leasing Agent's Georgia Real Estate License Number _____

Leasing Agent's Georgia Real Estate License Number _____

Multiple Listing Number _____

Member of: _____ of REALTORS®

Member of: _____ of REALTORS®

# **EXHIBIT C**

### PROMISSORY NOTE

$50,000.00                                                            February 13, 2019

FOR VALURE RECEIVED, after date and in the manner set forth herein, the undersigned, **Sunmi Nichols whose principal home address 185 Treadstone Overlook Suwanee Georgia 30024** (hereinafter collectively referred to as "Borrower"), promises to pay to the order of **NSEW GA, INC, a Georgia company, whose principal office address is 3625 Savannah Place Drive STE 200, Duluth, Georgia 30096** , its successors and assigns (hereinafter referred to as the "Lender"), the principal sum of **FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00)**, together with interest thereon on so much thereof as is from time to time outstanding in lawful money of the United States of America which shall at the time of payment be legal tender in payment of all debts and dues public and private, as follows:

1. Interest Rate and Payments.

(a)     Interest Rate. From the date hereof through the Maturity Date (as defined herein below), the principal balance owing under this Promissory Note, together with all other amounts due hereunder, shall accrue interest at the simple interest rate of **Three (3%)** percent per month. Interest shall be computed at said rate on the daily outstanding principal balance of the indebtedness evidenced by this Note on the basis of actual days elapsed in each interest period on the basis of a 30-day month.

(b)     Interest Only Payment. interest only monthly payment in the amount **of One Thousand Five Hundred and 00/100 Dollars ($1,500.00)** shall be made commencing on **the 13th day of February, 2019** and continuing on the 30th day of each successive month thereafter and in one final payment in the amount of **Fifty One Thousand Five Hundred and 00/100 Dollars ($51,500.00)** on the Maturity Date (as said term is hereinafter defined).

(c)     Maturity Date. If not sooner paid, the entire outstanding principal balance, together with all accrued and unpaid interest and any other amounts due hereunder, shall be due and payable in full on the Maturity Date. As used herein, the term "Maturity Date" shall mean the earlier of (i) **January 12, 2020**, or (ii) and Event of Default, as said term is hereinafter defined, not cured within any applicable cure period.

(d) Late Charge. At its option, lender may charge and collect a "late charge" equal to Two percent (2%) of the payment due hereunder or any of the loan Documents (as defined herein below), which is not paid within ten (10) days of when due, such charge to be due immediately, and such charge to be assessed at Lender's option regardless of whether lender shall gave given notice of failure to pay to Borrower. Lender shall not be obligated to accept any past due payment not accompanied by such additional amount.

2. Prepayment. This promissory Note may be prepaid in whole or in part at any time without penalty or premium.



3. Place of Payment. Payments hereunder shall be paid to lender at, **3625 Savannah Pl DR STE 200 Duluth, GA 30096** or to such other place and/or to such other person as lender may designate in writing from time to time.

4. Loan Documents. The indebtedness evidenced by this Promissory Note and the obligations created hereby may be secured by, without limitation, that certain Security Agreement of even date herewith (hereinafter referred to as the "Security Agreement") encumbering any and all assets of Borrower, if applicable. The Security Agreement, if any, together with this Promissory Note, any guaranty executed in conjunction with this Promissory Note, and all other documents to or of which Lender is a party or beneficiary now or hereafter evidencing, securing or otherwise relating to the indebtedness evidenced, securing or otherwise relating to the indebtedness evidenced hereby, are hereinafter collectively referred to as the "Loan Documents".

5. Default. It is expressly agreed that any of the following occurrences shall constitute a default (hereinafter referred to as an "event of Default") hereunder: (A) should any payment required by this Promissory Note or any of the other loan Documents not be paid in full when due, provided, however, Lender agrees to provide Borrower with written notice of this Event of Default and provide Borrower with ten (10) days within which to cure an Event of Default involving the payment of money, which notice shall not require to be given by the Lender if Lender has previously given one (1) such written notice of an Even of Default within twelve (12) months of any preceding Event of Default by Borrower; (C) should Borrower (or any successor in title to borrower or principal of Borrower) (i) become insolvent, (ii) commit any act of bankruptcy, (iii) make an assignment for the benefit of creditors, (iv) authorize the filing of or file a voluntary petition in bankruptcy, (v) should a receiver of any of Borrower's property be appointed, (vi) should involuntary bankruptcy proceedings be filed or threatened against Borrower, or (vii) should Borrower sell or attempt to sell substantially all of its assets; (D) should Borrower in any way default under the terms of (i) the security Agreement executed contemporaneously herewith to secure the indebtedness evidenced by this Promissory Note, or (ii) any other Document evidencing or securing the indebtedness by this Promissory Note, or (iii) any other agreement or instrument executed by and between lender and Borrower; (E) should any representation, warranty , promise or statement made by Borrower to Lender, in connection with this Promissory Note, any of the loan Documents, or any other agreement or instrument executed by and between lender and Borrower, be or have been when made in any way false or incorrect in any material respect; (F) should any of Borrower's property in which Lender has a lien or security interest for the purposes of securing this or any other loan between Lender and Borrower be attached or otherwise taken by another creditor or any governmental authority; (G) should Borrower fail at any time to maintain adequate insurance to protect the collateral; (H) should Borrower suspend or cease operation of its present business; or (I) should Lender at any time, reasonably in good faith believe that Borrower's ability to repay either (i) all or any part of the indebtedness evidenced hereunder, or (ii) all or any part of any other indebtedness Borrower owes to Lender, is materially impaired; then and in any such Even of Default the entire unpaid principal sum evidenced by this Promissory Note, together with all interest accrued thereon and all other amounts due hereunder, shall, at the option of Lender and without additional notice to the Borrower, at once become due and payable and shall bear interest at the Default Interest Rate (as hereinafter defined) from the date of such Event of Default, and may be collected forthwith, regardless of the Maturity Date, time being of the essence of this Promissory Note. It is further agreed that the failure of Lender to



exercise this right of acceleration, or Lender's indulgence of any Event of Default as may be granted from time to time, shall in no event be considered a waiver of such right of acceleration or estop Lender from exercising such right during the pendency of any present or subsequent default hereunder or under the Loan Documents. The Default Interest Rate shall be the lesser of (i) the highest rate permitted by law, or (ii) twelve (12%) percent per annum. All such interest shall be paid at the time of and as a condition precedent to the curing of any such Event of Default should lender, at its sole option, allow such Event of Default to be cured. In the event this Promissory Note, or any part thereof, is collected by or through an attorney at law, Borrower agrees to pay (in limited to, reasonable attorney's fees actually incurred, and all court costs and other expenses actually incurred by Lender.

6. Lender's Remedies. Lender's remedies, upon the occurrence of any Event of Default hereunder, shall include but in no way be limited to the following: (A) lender may exercise a right of set-off against any right Borrower may have to receive payment of any kind from Lender; (B) Lender may exercise any right or remedy which Lender has under this Promissory Note or any of the Loan Document; (C) Lender may demand additional security or additional guarantors to insure repayment of this Promissory Note; or (D) Lender may exercise any and all right or remedy which Lender has under this Promissory Note or any of the Loan Document; (C) Lender may demand additional security or additional guarantors to insure repayment of this Promissory Note; or (D) lender may exercise any and all rights of a secured party which accrue to Lender under the Georgia and/or California Uniform Commercial Code, in any order thereunder permitted, and may make use of any other remedy afforded lender under any other applicable state or federal statute. in no event shall the failure of lender to exercise any or all of the above referenced remedies upon the occurrence of any Event of Default hereunder be considered a waiver of Lender's right to exercise any of Lender's remedies upon the occurrence of any other Event of Default hereunder.

7. Notices. Any notices, whether to Borrower, lender or any other party to this Note, shall be in writing an sent via certified mail, return receipt requested, postage prepaid, or by any national recognized, commercially reliable form of overnight mail, mailed to the address of such party as set forth above. Any such notice shall be deemed to have been properly given or served and shall be effective on the day which is the third (3rd) calendar day after being so deposited with a nationally recognized, commercially reliable overnight delivery service or in the United States mail, or upon the date of actual receipt, whichever shall sooner occur. Personal delivery to a party or to any officer, partner, agent, spouse, or employee of such party at said address shall constitute receipt. A party may change its address to another address within the continental United States, provided that such change shall not be effective until receipt of such written notice is acknowledged by lender. Rejection or other refusal to accept or inability to deliver notices because of changed address of which no notice has been received shall also constitute receipt.

8. Successors and Assigns. Whenever reference is made herein to "Lender" or "Borrower," such reference shall be deemed to refer to and include the legal representatives, successors and assigns thereof, the same as if in each case expressed, it being expressly agreed that the rights and obligations of all parties named herein or liable hereunder shall inure to the benefit of and be binding upon such parties and their respective heirs, executors, legal representatives, successors and assigns.



9. Waiver. Borrower, for itself, its successors and assigns, hereby expressly waives, to the fullest extent permitted by applicable law, presentment for payment, demand, of demand, notice of dishonor, protest, notice of protest, diligence in collection and all other notice hereof except as expressly provided for herein, and hereby consents to any and all indulgences granted by lender, or any substitution, exchange or release of collateral permitted by Lender, all without in any way modifying, altering, releasing, affecting or limiting the validity of the indebtedness evidenced hereby or impairing any of Lender's rights following an Event of Default hereunder. No failure to accelerate the debt evidenced hereby by reason of an Event of Default from time to time shall be construed (i) as a novation of this promissory Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of lender thereafter to insist upon strict compliance with the terms of this Promissory Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the United States or any State thereof, and Borrower hereby expressly waives the benefit of any statute or rule of law or equity not provided, or which may hereafter be provided, which would produce a result contradictory to or in conflict with the foregoing. No extension of the time for payment of this Promissory Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Promissory Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Promissory Note, either in whole or in part, unless Lender agrees otherwise in writing.

10. Governing law. This Promissory Note is intended to Constitute a contract under and shall be construed, interpreted and enforced in accordance with the laws of the Stated of Georgia and all applicable federal laws and regulations, and the Borrower hereby consents to the jurisdiction of the courts of the State of Georgia and the federal courts located in the State of Georgia for resolution of any matters relating to this Note.

11. Remedies Cumulative. The remedies of Lender as provided herein, or in the Loan Documents, if any, or at law or in equity, shall be cumulative and concurrent and may be pursued singly, successively, or together at the sole discretion of the Lender, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. This Promissory Noted may not be modified or terminated orally but only by agreement or discharge in writing and signed by the party who is the owner and holder of this Promissory Note at the time endorsement of any waiver, modification or discharge is sought.

12 Unconditional Obligation. The obligation of the Borrower to make or cause to be made the payments required hereunder shall be absolute and unconditional. The borrower shall pay or cause to be paid without abatement, diminution, postponement or deduction (whether for taxes or otherwise) all such amounts regardless of any cause or circumstance whatsoever, including, without limitation, any defense, set-off, recoupment or counterclaim which the undersigned may have or asset against Lender.

13. Usury. It is the intention of the lender and the Borrower to conform strictly to the usury laws now or hereafter in force. If fulfillment of any provision of this Promissory Note shall at any time involve transcending the limit of validity presently prescribed by any applicable usury statue or any other applicable law, then ipso facto and eo instant, the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this promissory Note that is in excess of the then current limit of such validity, but such obligations shall be fulfilled to the limit of such



validity. In the event the maturity of this promissory Note is accelerated by reason of any provision hereof or by reason of an election by the holder hereof resulting from an Event of Default (or any other event permitting acceleration) under the loan Documents, voluntary prepayment by the undersigned, or otherwise, then earned interest hereunder may never include more than the maximum amount permitted by law, computed from the dates of each advance of loan proceeds hereunder until payment, any interest in excess of the maximum amount permitted by law shall be cancelled automatically and, if theretofore paid, shall at the option of the holder hereof either be rebated to the undersigned or credited on the principal amount of this Promissory Note, or if all principal has been repaid, then the excess shall be rebated the to undersigned.

14. Waiver of Jury Trail. BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE PROMISSORY NOTE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PROVISION IN ANY PROCEEDING AS CONCLUSIVE EVIDENVE OF THIS WAIVER BY BORROWER. BORROWER UNDERSTATNDS THAT THIS WAIVER IS A WAIVER OF A CONSTITUTIONAL SAFEGUARD, AND BORROWER BELIEVES THAT THERE ARE SUFFICENT ALTERATE PROCEDURAL AND SUBSTANTIVE SAFEGUARDS, INCLUDING A TRIAL BY AN IMPARTIAL JUDGE, THAT ADEQUATELY OFFSET THE WAIVER CONTAINED HEREIN.

15. Continuing Enforcement. if, after receipt of any payment of all or any part of this Promissory Note, Lender is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Promissory Note and the other loan Documents, if any, shall remain liable for, and shall indemnify, defend and hold lender harmless with respect to the full amount so surrendered. The provisions of this paragraph shall survive the cancellation or termination of this Promissory Note and shall remain effective notwithstanding the payment of the securing this Promissory Note, or any other action which lender may have taken in reliance upon its receipt of such payment. Any cancellation, release or such other action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

16. Time of Essence. Time is of the essence of this Promissory Note.

17. Captions. The captions of the paragraphs of this Promissory Note are for convenience only and are not intended to be, nor shall be, construed as being a part hereof and shall not limit, expand or otherwise affect any of the terms hereof.

[Remainder of page intentionally left blank; Signatures on following pages]

IN WITNESS WHEREOF, the Borrower has caused this Promissory Note to be duly executed under seal as the day and year first above written.

BORROWER (ENTITY):

Sunmi Nichols   a Georgia resident

_____ (SEAL)

Sunmi Nichols

GA Driver License:

SS #: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

# **EXHIBIT D**

## PROMISSORY NOTE

$60,000.00

February 13, 2019

FOR VALURE RECEIVED, after date and in the manner set forth herein, the undersigned, **Sunmi Nichols whose principal home address 185 Treadstone Overlook Suwanee Georgia 30024** (hereinafter collectively referred to as "Borrower"), promises to pay to the order of **NSEW GA, INC, a Georgia company, whose principal office address is 3625 Savannah Place Drive STE 200, Duluth, Georgia 30096** , its successors and assigns (hereinafter referred to as the "Lender"), the principal sum of **Sixty THOUSAND AND NO/100 DOLLARS ($60,000.00)**, together with interest thereon on so much thereof as is from time to time outstanding in lawful money of the United States of America which shall at the time of payment be legal tender in payment of all debts and dues public and private, as follows:

1. Interest Rate and Payments.

(a)      Interest Rate. From the date hereof through the Maturity Date (as defined herein below), the principal balance owing under this Promissory Note, together with all other amounts due hereunder, shall accrue interest at the simple interest rate of **Two (2%)** percent per month. Interest shall be computed at said rate on the daily outstanding principal balance of the indebtedness evidenced by this Note on the basis of actual days elapsed in each interest period on the basis of a 30-day month.

(b)      Interest Only Payment. interest only monthly payment in the amount **of One Thousand Two Hundred and 00/100 Dollars ($1,200.00)** shall be made commencing on **the 13th day of February, 2019** and continuing on the 30th day of each successive month thereafter and in one final payment in the amount of **Sixty One Thousand Two Hundred and 00/100 Dollars ($61,200.00)** on the Maturity Date (as said term is hereinafter defined).

(c)      Maturity Date. If not sooner paid, the entire outstanding principal balance, together with all accrued and unpaid interest and any other amounts due hereunder, shall be due and payable in full on the Maturity Date. As used herein, the term "Maturity Date" shall mean the earlier of (i) **January 12, 2020**, or (ii) and Event of Default, as said term is hereinafter defined, not cured within any applicable cure period.

(d) Late Charge. At its option, lender may charge and collect a "late charge" equal to Two percent (2%) of the payment due hereunder or any of the loan Documents (as defined herein below), which is not paid within ten (10) days of when due, such charge to be due immediately, and such charge to be assessed at Lender's option regardless of whether lender shall gave given notice of failure to pay to Borrower. Lender shall not be obligated to accept any past due payment not accompanied by such additional amount.

2. Prepayment. This promissory Note may be prepaid in whole or in part at any time without penalty or premium.



3. Place of Payment. Payments hereunder shall be paid to lender at, **3625 Savannah Pl DR STE 200 Duluth, GA 30096** or to such other place and/or to such other person as lender may designate in writing from time to time.

4. Loan Documents. The indebtedness evidenced by this Promissory Note and the obligations created hereby may be secured by, without limitation, that certain Security Agreement of even date herewith (hereinafter referred to as the "Security Agreement") encumbering any and all assets of Borrower, if applicable. The Security Agreement, if any, together with this Promissory Note, any guaranty executed in conjunction with this Promissory Note, and all other documents to or of which Lender is a party or beneficiary now or hereafter evidencing, securing or otherwise relating to the indebtedness evidenced, securing or otherwise relating to the indebtedness evidenced hereby, are hereinafter collectively referred to as the "Loan Documents".

5. Default. It is expressly agreed that any of the following occurrences shall constitute a default (hereinafter referred to as an "event of Default") hereunder: (A) should any payment required by this Promissory Note or any of the other loan Documents not be paid in full when due, provided, however, Lender agrees to provide Borrower with written notice of this Event of Default and provide Borrower with ten (10) days within which to cure an Event of Default involving the payment of money, which notice shall not require to be given by the Lender if Lender has previously given one (1) such written notice of an Even of Default within twelve (12) months of any preceding Event of Default by Borrower; (C) should Borrower (or any successor in title to borrower or principal of Borrower) (i) become insolvent, (ii) commit any act of bankruptcy, (iii) make an assignment for the benefit of creditors, (iv) authorize the filing of or file a voluntary petition in bankruptcy, (v) should a receiver of any of Borrower's property be appointed, (vi) should involuntary bankruptcy proceedings be filed or threatened against Borrower, or (vii) should Borrower sell or attempt to sell substantially all of its assets; (D) should Borrower in any way default under the terms of (i) the security Agreement executed contemporaneously herewith to secure the indebtedness evidenced by this Promissory Note, or (ii) any other Document evidencing or securing the indebtedness by this Promissory Note, or (iii) any other agreement or instrument executed by and between lender and Borrower; (E) should any representation, warranty , promise or statement made by Borrower to Lender, in connection with this Promissory Note, any of the loan Documents, or any other agreement or instrument executed by and between lender and Borrower, be or have been when made in any way false or incorrect in any material respect; (F) should any of Borrower's property in which Lender has a lien or security interest for the purposes of securing this or any other loan between Lender and Borrower be attached or otherwise taken by another creditor or any governmental authority; (G) should Borrower fail at any time to maintain adequate insurance to protect the collateral; (H) should Borrower suspend or cease operation of its present business; or (I) should Lender at any time, reasonably in good faith believe that Borrower's ability to repay either (i) all or any part of the indebtedness evidenced hereunder, or (ii) all or any part of any other indebtedness Borrower owes to Lender, is materially impaired; then and in any such Even of Default the entire unpaid principal sum evidenced by this Promissory Note, together with all interest accrued thereon and all other amounts due hereunder, shall, at the option of Lender and without additional notice to the Borrower, at once become due and payable and shall bear interest at the Default Interest Rate (as hereinafter defined) from the date of such Event of Default, and may be collected forthwith, regardless of the Maturity Date, time being of the essence of this Promissory Note. It is further agreed that the failure of Lender to



exercise this right of acceleration, or Lender's indulgence of any Event of Default as may be granted from time to time, shall in no event be considered a waiver of such right of acceleration or estop Lender from exercising such right during the pendency of any present or subsequent default hereunder or under the Loan Documents. The Default Interest Rate shall be the lesser of (i) the highest rate permitted by law, or (ii) twelve (12%) percent per annum. All such interest shall be paid at the time of and as a condition precedent to the curing of any such Event of Default should lender, at its sole option, allow such Event of Default to be cured. In the event this Promissory Note, or any part thereof, is collected by or through an attorney at law, Borrower agrees to pay (in limited to, reasonable attorney's fees actually incurred, and all court costs and other expenses actually incurred by Lender.

6. Lender's Remedies. Lender's remedies, upon the occurrence of any Event of Default hereunder, shall include but in no way be limited to the following: (A) lender may exercise a right of set-off against any right Borrower may have to receive payment of any kind from Lender; (B) Lender may exercise any right or remedy which Lender has under this Promissory Note or any of the Loan Document; (C) Lender may demand additional security or additional guarantors to insure repayment of this Promissory Note; or (D) Lender may exercise any and all right or remedy which Lender has under this Promissory Note or any of the Loan Document; (C) Lender may demand additional security or additional guarantors to insure repayment of this Promissory Note; or (D) lender may exercise any and all rights of a secured party which accrue to Lender under the Georgia and/or California Uniform Commercial Code, in any order thereunder permitted, and may make use of any other remedy afforded lender under any other applicable state or federal statute. in no event shall the failure of lender to exercise any or all of the above referenced remedies upon the occurrence of any Event of Default hereunder be considered a waiver of Lender's right to exercise any of Lender's remedies upon the occurrence of any other Event of Default hereunder.

7. Notices. Any notices, whether to Borrower, lender or any other party to this Note, shall be in writing an sent via certified mail, return receipt requested, postage prepaid, or by any national recognized, commercially reliable form of overnight mail, mailed to the address of such party as set forth above. Any such notice shall be deemed to have been properly given or served and shall be effective on the day which is the third (3rd) calendar day after being so deposited with a nationally recognized, commercially reliable overnight delivery service or in the United States mail, or upon the date of actual receipt, whichever shall sooner occur. Personal delivery to a party or to any officer, partner, agent, spouse, or employee of such party at said address shall constitute receipt. A party may change its address to another address within the continental United States, provided that such change shall not be effective until receipt of such written notice is acknowledged by lender. Rejection or other refusal to accept or inability to deliver notices because of changed address of which no notice has been received shall also constitute receipt.

8. Successors and Assigns. Whenever reference is made herein to "Lender" or "Borrower," such reference shall be deemed to refer to and include the legal representatives, successors and assigns thereof, the same as if in each case expressed, it being expressly agreed that the rights and obligations of all parties named herein or liable hereunder shall inure to the benefit of and be binding upon such parties and their respective heirs, executors, legal representatives, successors and assigns.

9. Waiver. Borrower, for itself, its successors and assigns, hereby expressly waives, to the fullest extent permitted by applicable law, presentment for payment, demand, of demand, notice of dishonor, protest, notice of protest, diligence in collection and all other notice hereof except as expressly provided for herein, and hereby consents to any and all indulgences granted by lender, or any substitution, exchange or release of collateral permitted by Lender, all without in any way modifying, altering, releasing, affecting or limiting the validity of the indebtedness evidenced hereby or impairing any of Lender's rights following an Event of Default hereunder. No failure to accelerate the debt evidenced hereby by reason of an Event of Default from time to time shall be construed (i) as a novation of this promissory Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of lender thereafter to insist upon strict compliance with the terms of this Promissory Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the United States or any State thereof, and Borrower hereby expressly waives the benefit of any statute or rule of law or equity not provided, or which may hereafter be provided, which would produce a result contradictory to or in conflict with the foregoing. No extension of the time for payment of this Promissory Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Promissory Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Promissory Note, either in whole or in part, unless Lender agrees otherwise in writing.

10. Governing law. This Promissory Note is intended to Constitute a contract under and shall be construed, interpreted and enforced in accordance with the laws of the Stated of Georgia and all applicable federal laws and regulations, and the Borrower hereby consents to the jurisdiction of the courts of the State of Georgia and the federal courts located in the State of Georgia for resolution of any matters relating to this Note.

11. Remedies Cumulative. The remedies of Lender as provided herein, or in the Loan Documents, if any, or at law or in equity, shall be cumulative and concurrent and may be pursued singly, successively, or together at the sole discretion of the Lender, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. This Promissory Noted may not be modified or terminated orally but only by agreement or discharge in writing and signed by the party who is the owner and holder of this Promissory Note at the time endorsement of any waiver, modification or discharge is sought.

12 Unconditional Obligation. The obligation of the Borrower to make or cause to be made the payments required hereunder shall be absolute and unconditional. The borrower shall pay or cause to be paid without abatement, diminution, postponement or deduction (whether for taxes or otherwise) all such amounts regardless of any cause or circumstance whatsoever, including, without limitation, any defense, set-off, recoupment or counterclaim which the undersigned may have or asset against Lender.

13. Usury. It is the intention of the lender and the Borrower to conform strictly to the usury laws now or hereafter in force. If fulfillment of any provision of this Promissory Note shall at any time involve transcending the limit of validity presently prescribed by any applicable usury statue or any other applicable law, then ipso facto and eo instant, the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this promissory Note that is in excess of the then current limit of such validity, but such obligations shall be fulfilled to the limit of such

validity. In the event the maturity of this promissory Note is accelerated by reason of any provision hereof or by reason of an election by the holder hereof resulting from an Event of Default (or any other event permitting acceleration) under the loan Documents, voluntary prepayment by the undersigned, or otherwise, then earned interest hereunder may never include more than the maximum amount permitted by law, computed from the dates of each advance of loan proceeds hereunder until payment, any interest in excess of the maximum amount permitted by law shall be cancelled automatically and, if theretofore paid, shall at the option of the holder hereof either be rebated to the undersigned or credited on the principal amount of this Promissory Note, or if all principal has been repaid, then the excess shall be rebated to the undersigned.

14. Waiver of Jury Trail. BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE PROMISSORY NOTE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PROVISION IN ANY PROCEEDING AS CONCLUSIVE EVIDENVE OF THIS WAIVER BY BORROWER. BORROWER UNDERSTATNDS THAT THIS WAIVER IS A WAIVER OF A CONSTITUTIONAL SAFEGUARD, AND BORROWER BELIEVES THAT THERE ARE SUFFICENT ALTERATE PROCEDURAL AND SUBSTANTIVE SAFEGUARDS, INCLUDING A TRIAL BY AN IMPARTIAL JUDGE, THAT ADEQUATELY OFFSET THE WAIVER CONTAINED HEREIN.

15. Continuing Enforcement. if, after receipt of any payment of all or any part of this Promissory Note, Lender is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Promissory Note and the other loan Documents, if any, shall remain liable for, and shall indemnify, defend and hold lender harmless with respect to the full amount so surrendered. The provisions of this paragraph shall survive the cancellation or termination of this Promissory Note and shall remain effective notwithstanding the payment of the securing this Promissory Note, or any other action which lender may have taken in reliance upon its receipt of such payment. Any cancellation, release or such other action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

16. Time of Essence. Time is of the essence of this Promissory Note.

17. Captions. The captions of the paragraphs of this Promissory Note are for convenience only and are not intended to be, nor shall be, construed as being a part hereof and shall not limit, expand or otherwise affect any of the terms hereof.

[Remainder of page intentionally left blank; Signatures on following pages]

IN WITNESS WHEREOF, the Borrower has caused this Promissory Note to be duly executed under seal as the day and year first above written.

BORROWER (ENTITY):

Sunmi Nichols   a Georgia resident

_____ (SEAL)

Sunmi Nichols

GA Driver License:

SS #:

# **EXHIBIT E**

After Recording Return to:
Michelle Kwak
**10015 Lauren Hall Court**
**Alpharetta, GA 30022**

Parcel Number: 11-134005130566

STATE OF GEORGIA
COUNTY OF FULTON

# LIMITED WARRANTY DEED

THIS INDENTURE, made the **05th** day of **February, 2019** between **SUN MI NICHOLS** hereinafter called Grantor, and **MICHELLE KWAK** hereinafter called Grantee(the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

WITNESSETH that: Grantor, for and in consideration of the sum of **TEN AND 00/100($10.00) Dollars** and other valuable considerations in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, by these presents does hereby remise, convey and forever QUITCLAIM unto the said Grantee:

**ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 513, 1ST DISTRICT, 1ST SECTION, FULTON COUNTY, GEORGIA, BEING LOT 180, BLOCK A, POD B & C, RIVER WALK SUBDIVISION, UNIT TWO, PHASE THREE, AS PER PLAT RECORDED IN PLAT BOOK 202, PAGES 93-95, FULTON COUNTY, GEORGIA RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.**

THIS DEED IS GIVEN SUBJECT TO ALL RESTRICTIONS, EASEMENTS AND RIGHTS OF WAY OF RECORD.

TO HAVE AND TO HOLD the said tract or parcel of land, together with all and rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee, forever in FEE SIMPLE.

AND THE SAID Grantor will warrant and forever defend the right and title to the above described property unto the said Grantee against the claims of all persons by, through and under the above named grantor.

IN WITNESS WHEREOF, the Grantor has hereunto set grantor's hand and seal thi day and year first above written.

Signed, sealed and delivered in the presence of:

_____
Witness

_____ (SEAL)
SUN MI NICHOLS

_____ (Seal)
(Notary Public)

expire: 03/05/2021

Deed Book 59695 Pg 664
Filed and Recorded Feb-14-2019 10:20am
2019-0103985
Real Estate Transfer Tax $0.00
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

# EXHIBIT F

# Ten Day Notice

**Venus Skin Care LLC**                                    **March 05, 2019**
**Sun Mi Nichols**
**185 Treadstone Overlook**
**Suwanee, GA 30024**

**RE: Past Due for Rent $2,000.00**
**Property: 3625 Savannah Place STE101 & 102**

Dear Ms. Sun Mi Nichols:

Due to the delinquency of your balance, It will be charged off and entire balance has been accelerated. Accordingly, your entire balance is now due and owing. In addition, we have reported your account as charged off to the credit reporting agencies to which we report.

Unless you notify us within 10 days after receiving this notice that you dispute the validity of this debt or any portion thereof, we will assume this debt is valid. If you notify us in writing 10 days from receiving this notice that you dispute the validity of this debt or any portion thereof, we will; obtain verification of the debt or obtain a copy of a **JUDGEMENT** and mail you a copy of such **JUDGEMENT** or verification.

As of the date of this letter, you owe the balance. Because of interest charge that may vary from day to day, the amount due on the day you pay may be greater. Hence, If you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. For further information

Sincerely,

NSEW GA INC